**UNITED STATES DISTRICT COURT**

**MIDDLE DISTRICT OF LOUISIANA**

**FEDERAL INSURANCE COMPANY**                    **CIVIL ACTION**

**VERSUS**

**NEW HAMPSHIRE INSURANCE**                      **NO. 03-385-BAJ-M2**
**COMPANY**

## NOTICE

Please take notice that the attached Magistrate Judge's Report has been filed with the Clerk of the United States District Court.

In accordance with 28 U.S.C. § 636(b)(1), you have 14 days from the date of service of this Notice to file written objections to the proposed findings of fact and conclusions of law set forth in the Magistrate Judge's Report.  The failure of a party to file written objections to the proposed findings, conclusions, and recommendation contained in a Magistrate Judge's Report and Recommendation within 14 days after being served with a copy of the Report shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions of the Magistrate Judge that have been accepted by the District Court.

ABSOLUTELY NO EXTENSION OF TIME SHALL BE GRANTED TO FILE WRITTEN OBJECTIONS TO THE MAGISTRATE JUDGE'S REPORT.

Signed in chambers in Baton Rouge, Louisiana, July 30, 2010.

**MAGISTRATE JUDGE CHRISTINE NOLAND**

## UNITED STATES DISTRICT COURT

## MIDDLE DISTRICT OF LOUISIANA

**FEDERAL INSURANCE COMPANY**                                    **CIVIL ACTION**

**VERSUS**

**NEW HAMPSHIRE INSURANCE**                              **NO. 03-385-BAJ-M2**
**COMPANY**

## MAGISTRATE JUDGE'S REPORT

This matter is before the Court on the Motion for Summary Judgment (R. Doc. 50)

filed by defendant, New Hampshire Insurance Company ("New Hampshire").  Plaintiff,

Federal Insurance Company ("Federal"), has filed an opposition (R. Doc. 56) to such

motion, in response to which New Hampshire has filed a reply memorandum (R. Doc. 57).

Federal has also filed a motion for oral argument (R. Doc. 60).

## FACTS & PROCEDURAL BACKGROUND

New Hampshire issued Policy No. 595/X00183OP to Thomas & Betts Corporation

("T&B") with effective dates of January 1, 1999 to January 1, 2000.  Under that policy, New

Hampshire agreed to pay sums that T&B "becomes legally obligated to pay by reason of

liability imposed by law or assumed by [T&B] under an Insured Contract because of Bodily

Injury, Property Damage, Personal Injury, or Advertising Injury that takes place during the

Policy Period."  *See*, R. Doc. 50-4, at 3128.  The New Hampshire policy further defines

"bodily injury" as "bodily injury, sickness, or disease" plus any "mental injury, mental

anguish, humiliation, shock or death if directly resulting from bodily injury, sickness or

disease."  *Id.*, at 3131.  The New Hampshire policy also defines "Insured Contract," in

pertinent part, as any oral or written contract or agreement entered into by T&B under

which T&B assumes another party's bodily injury tort liability.  *Id.*, at 3133.

1

On July 5, 1999, a massive explosion took place at the Kaiser Chemical Plant in Gramercy, Louisiana, and as a result of such explosion, thousands of people who sustained injuries, including an individual by the name of Wayne Robins ("Robins"), filed personal injury lawsuits against Kaiser and other defendants, including T&B. Those cases were later consolidated in a suit captioned *In re Gramercy Plant Explosion at Kaiser*, Master Suit No. 25,975. Among the consolidated lawsuits was *AXA Global Risks, et al v. Thomas & Betts, et al*, Suit No. 26,865. The plaintiffs in that suit were AXA Global Risks ("AXA") and other property insurers who had paid large sums of money for business interruption and property damages losses to Kaiser as a result of the explosion and who sought to recover those payments from T&B and other defendants by way of subrogation.

Shortly before consolidation of the various lawsuits, in November 2000, AXA agreed to loan Robins $400,000 to secure his participation as a joint plaintiff in the underlying lawsuits. That loan is documented in a written agreement that outlined the various rights and duties of Robins, AXA, and their counsel. *See*, R. Doc. 50-8, at NH 003341-51. Eleven (11) months later, on October 6, 2001, and on the eve of the trial of the consolidated lawsuits, AXA entered into another agreement with Robins. In that second agreement, it agreed to loan him an additional $500,000 in exchange for his continued participation as a party plaintiff, and that agreement required that Robins repay the total of $900,000 in loans only if Robins settled his claims against T&B or another defendant, Manpower, without first obtaining the written consent of AXA's counsel. *Id.*, at NH 003352-59. The second loan agreement, in Paragraph VII.5, further provided that, if Robins settled with T&B or Manpower without the consent of AXA's counsel, he would pay AXA a

2

$300,000 penalty. *Id.,* at NH 003355.

The day after the second loan agreement was negotiated between AXA and Robins, October 7, 2001,[1] Robins and T&B entered into a "Memorandum of Agreement," which included the following terms:

1.    Thomas & Betts Corporation and its insurers agree to pay Wayne Robins, et al Five Million Dollars ($5,000,000.00) as a result of that lawsuit entitled *In Re: Gramercy Plant Explosion at Kaiser*, and Master Docket Number 25,975, 23rd Judicial District Court, St. James Parish, Louisiana and, *Wayne Robins, Carolyn Robins, Shamita Robins, Damita Robins,* Docket Number 26,671, 23rd Judicial District Court, Louisiana.

2.    Payment shall be made within (60) days of the signing of this agreement as required under Louisiana law.

3.    Wayne Robins agrees not to settle with Manpower, Inc. & Manpower International without consulting with Thomas & Betts Corporation and its Insurers.

4.    Wayne Robins agrees to pay Thomas & Betts Corporation seventy-five (75%) percent of any judgment that may be obtained against Manpower International, Inc. and Manpower, Inc.

5.    Thomas & Betts and its insurers agree to hold harmless, indemnify and defend Wayne Robins, et al, The Fields Law Firm and Cleo Fields for any amount owed to AXA, Kaisers Subrogated Property Reinsurers, Caleb Didriksen and the Didriksen Law Firm, not to exceed [$]1.2 million dollars.[2]

---

[1] Such day was the Sunday before trial of the consolidated lawsuits, which began on Monday, October 8, 2001.

[2] AXA was represented in its suit against T&B by Caleb Didriksen of The Didriksen Law Firm. Thus, Caleb Didriksen was the attorney with whom Robins negotiated the two loan agreements with AXA and from whom Robins was required to obtain consent prior to settling with T&B or Manpower.

*See*, R. Doc. 50-8, NH 003360.   According to Federal's allegations in this suit, the "Memorandum of Agreement" was entered into because T&B, and its insurers, recognized the necessity of settling with Robins to obtain strategic benefits to its defense strategy associated with having one of the major plaintiffs in the Kaiser litigation not directly aiming liability at T&B.  *See*, Amended Complaint, ¶6(a).

Despite Federal's contention that New Hampshire was aware of and concurred in the above-litigation strategy, evidence presented by New Hampshire, with its present motion, indicates that it had no role in negotiating the above "Memorandum of Agreement" on October 7, 2001 and that it was not provided with a copy of same until after it had been signed by T&B and Robins.  *See*, Exhibit C to New Hampshire's motion.  Notwithstanding its alleged lack of involvement in the Robins' settlement negotiations, New Hampshire nevertheless agreed to pay $5 million in settlement of Robins' claims and therefore deposited that sum with the court.  In a letter dated October 24, 2001, however, New Hampshire specifically advised T&B that it did not agree to the indemnity language set forth in Paragraph 5 of the "Memorandum of Agreement."  *Id.*[3]

Because Robins did not obtain the consent of AXA's counsel prior to entering the October 7, 2001 "Memorandum of Agreement" with T&B, AXA made a written demand

---

[3] In the October 24, 2001 letter, James Maddiona, Assistant Vice President of AIGTS, Inc., explained that, acting on behalf of New Hampshire, AIGTS had previously authorized a settlement of Robins' claims against T&B in the amount of $5 million, subject to the right to receive reimbursement of 75% of any settlement or judgment obtained by Robins from the Manpower and Schweitzer defendants.  *Id.*  Maddiona specifically stated, however, that, to the extent Robins or any other person should contend that New Hampshire undertook any "hold harmless obligation" in the October 7, 2001 "Memorandum of Agreement," then such agreement was "either an inaccurate record of the terms of the settlement or it was executed without the consent or authority of New Hampshire."  *Id.*

upon Robins on December 11, 2001 to repay the $900,000 loan that AXA had made to him and that he pay the $300,000 penalty as set forth in Paragraph VII.5 of the October 6, 2001 loan agreement.  New Hampshire maintained its position at that point that, while it would pay $5 million toward settlement of Robins' claims, it would not pay the additional sums referenced in Paragraph 5 of the "Memorandum of Agreement" because such sums were not covered under T&B's insurance policy with New Hampshire.  In January 2002, Federal, as the insurer of T&B under a policy of excess insurance, stepped in and paid $990,000 to settle T&B's agreement to indemnify Robins as provided in Paragraph 5 of the "Memorandum of Agreement."  Through the present suit, Federal seeks reimbursement of that $990,000 from New Hampshire under theories of legal and contractual subrogation.

New Hampshire has now filed a motion for summary judgment, wherein it contends that Federal's claims should be dismissed because the payment made by Federal is not covered under the liability policy that New Hampshire issued to T&B.

## LAW & ANALYSIS

**I.      Summary judgment standard:**

Summary judgment is appropriate where the pleadings, discovery products, and affidavits show that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law.  Fed. Rule Civ. Proc. 56(c).  A "genuine issue" exists when a reasonable jury could resolve the disputed fact(s) in favor of the non-movant, and a "material" fact is one that might affect the outcome of the suit under the governing substantive law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986).  Only if the nonmoving party sets forth specific facts and evidence supporting the allegations essential

to his/her claim will a genuine issue of material fact be found to exist.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 327, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986).[4]

**(B)    Analysis:**

Federal does not dispute that it cannot recover the $990,000 it paid on behalf of T&B and that it seeks to recover from New Hampshire in this lawsuit unless that payment was covered under the insurance policy New Hampshire issued to T&B.[5]  The undersigned therefore agrees with New Hampshire that the existence of coverage under the New Hampshire policy for the $990,000 payment by Federal involves a dispositive question of law that is susceptible to resolution through summary judgment procedure.[6]

As mentioned above, under the policy in question (and like most general liability

---

[4] The nonmoving party may not rely upon pleadings, conclusory allegations, unsubstantiated assertions or arguments alone, but instead must come forward with evidence based on personal knowledge that demonstrates the existence of a material fact.  *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994).  If the record taken as a whole does not lead a rational trier of fact to find for the non-moving party, no genuine issue of material fact exists, and the mover is entitled to summary judgment as a matter of law.  *Id.*

[5] Louisiana law also establishes that conventional and legal subrogation principles can give a subrogee (here, Federal) no greater rights than the subrogor (here, T&B) could have exercised.  As such, if T&B has no rights under its policy with New Hampshire to be reimbursed for the $990,000 paid in conjunction with Paragraph 5 of the "Memorandum of Agreement," Federal likewise has no rights to reimbursement of same.  *Institute of London Underwriters v. First Horizon Ins. Co.*, 972 F.2d 125, 127 (5th Cir. 1992).

[6] *See, Principal Health Care v. Lewer Agency*, 38 F.3d 240, 242 (5th Cir. 1996)(Interpretation of an insurance policy is a question of law, and cases involving the interpretation of an insurance policy are appropriate for disposition on summary judgment); *Johnson v. Evan Hall Sugar Co-op, Inc.*, 2001-2956 (La. App. 1 Cir. 12/30/02), 836 So.2d 484 (Whether an insurance policy, as a matter of law, provides or precludes coverage is a dispute which can properly be resolved within the framework of a motion for summary judgment).

policies), New Hampshire agreed to pay sums that T&B "becomes legally obligated to pay by reason of liability imposed by law *or* assumed by [T&B] under an Insured Contract *because of Bodily Injury*, Property Damage, Personal Injury, or Advertising Injury that takes place during the Policy Period." [Emphasis added].   New Hampshire contends that, in negotiating the "Memorandum of Agreement" with Robins, T&B agreed to pay him $5 million to settle the bodily injury tort claims he had asserted against T&B as a result of the Kaiser plant explosion and that it paid that $5 million amount.   New Hampshire, however, asserts that it was not obligated, under the policy it issued to T&B, to pay the additional $1.2 million set forth in Paragraph 5 of the "Memorandum of Agreement" since payment of that sum was not "because of" and was not the "direct result of" Robins' bodily injury claims.   Instead, according to New Hampshire, payment of such additional $1.2 million resulted from Robins' breach of the loan agreements/contracts that he had entered into with AXA -- such breach having occurred because Robins failed to obtain the consent of AXA's counsel prior to settling with T&B.   Put another way, New Hampshire contends that its general liability policy does not cover the $1.2 million in economic damages that resulted from Robins' breach of his loan contracts with AXA since such damages are not:  (1) a settlement of damages flowing from Robins' bodily injuries; or (2) a contractual assumption by T&B of tort liability.   The undersigned agrees.

The United States Fifth Circuit Court of Appeals has held that the phrase "legally obligated to pay as damages" in a commercial general liability policy applies only to tort-based obligations, not to obligations stemming from a breach of contract.  *Data Specialties,*

*Inc. v. Transcontinental Ins. Co.*, 125 F.3d 909 (5th Cir. 1997).[7]  Specifically, the Fifth Circuit has held, that "[i]n light of the interpretation of the phrase 'legally obligated to pay as damages' given by courts of other states and by insurance treatises, the necessary requirement for coverage [under a CGL policy] is that the insured's tortious conduct must have caused the damages."[8]  Thus, in determining whether T&B's general liability policy

---

[7] *See also, Trade-Winds Environmental Restoration v. Stewart*, 653 F.Supp.2d 649, 653 (E.D.La. 2009)(commercial liability policies have been construed to preclude claims for contractual liability of an insured for economic loss); *American States Ins. Co. v. Pioneer Elec. Co.*, 85 Supp.2d 1337, 1343 (S.D.Fla. 2000)(Insured's failure to maintain workers compensation insurance to cover injuries to employees was not an "accident," but instead was a breach of contractual obligations that was not covered under its liability insurance policy); *Nutmeg Ins. Co. v. Clear Lake City Water Auth.*, 229 F.Supp.2d 668 (D.Tex. 2002)("liability policies do not cover intentional breach of contract . . . the purpose of [such] insurance is to protect insureds against unknown, or fortuitous, risks").

[8] Other circuits have held similarly, and learned insurance law treatises and commentators also provide that general statement of law.  *See, VBF, Inc. v. Chubb Group Ins. Companies,* 263 F.3d 1226, 1231 (10th Cir. 2001)("The phrases 'legally obligated to pay' and 'liability imposed by law' refer only to tort claims and not contract claims")(internal citations omitted); *Stanford Ranch, Inc. v. Maryland Cas. Co.*, 89 F.3d 618, 624 (9th Cir. 1996)("California courts have consistently interpreted this language ['legally obligated to pay'] to cover only tort liabilities and not those liabilities arising in contract"); 7A Lee R. Russ & Thomas F. Segalla, *Couch on Insurance* §103:14 (3d ed. 2008)("While the phrase 'legal liability' includes liability assumed by contract, the phrases 'liability imposed by law,' and 'legally obligated to pay as damages' do not"); 2 Allan D. Windt, *Insurance Claims and Disputes* § 11:7 (5th ed. 2009)("Numerous courts have held that the provision in an insuring clause agreeing to pay on behalf of the insured sums that the insured becomes 'legally obligated to pay as damages' refers to liability imposed by law for torts, and not to damages for breach of contract").

The renowned treatise *Couch on Insurance* explains that CGL policies:

> [A]re intended to provide coverage only for events which are fortuitous, unforeseeable events, and not for the foreseeable results of an insured's deliberate conduct, which would include a claim for breach of contract.  A [CGL] policy is designed and intended to provide coverage to the insured for tort liability for physical injury to the person or property of

with New Hampshire covers the $1.2 million liability set forth in Paragraph 5 of the "Memorandum of Agreement," the Court must look first to that requirement.

The damages set forth in Paragraph 5 stem, not from tortious conduct on the part of the insured, T&B, but instead from Robins' breach of the loan agreements that he entered into with AXA by not obtaining the consent of AXA's counsel prior to settling his bodily injury claims against T&B.  Thus, the damages in Paragraph 5 are economic damages stemming from a breach of contract, rather than bodily injury damages resulting from a tortious act.  Federal makes no attempt to dispute that premise in its opposition. Instead, it argues that, since the payment contained in Paragraph 5 is a part of the overall settlement agreement between T&B and Robins relating to Robins' bodily injury claims in the Kaiser litigation and since that payment served as "consideration" for the settlement agreement, the payment in Paragraph 5 is covered by New Hampshire's CGL policy.

While the contractual indemnity payment contained in Paragraph 5 is tangentially related to the underlying bodily injury claims of Robins, in the sense that he would not have entered the loan agreements with AXA had he not been pursuing litigation against T&B and other defendants for his bodily injuries arising from the Kaiser plant explosion, the undersigned does not find such an indirect connection between the breach of contract claim and the underlying bodily injury claim is sufficient to warrant coverage under New Hampshire's CGL policy.  Such an interpretation of the "legally obligated to pay" as

---

others.  A [CGL] is not intended to provide coverage for the insured's contractual liability which merely causes economic losses.

Russ & Segalla, *supra*, §129:4.

9

damages "because of bodily injury" language in the policy would "distort the meaning of [the] provision and extend its reach so as to provide coverage for any liability where bodily injury is a tangential factor."  *Diamond State Insurance Company v. Chester-Jensen Co., Inc.*, 611 N.E.2d 1083 (Ill. 1993).[9]

Although not binding upon this Court, the undersigned finds the case of *Key Custom Homes, Inc. v. Mid-Continent Cas. Co.*, 450 F.Supp.2d 1311 (M.D.Fla. 2006), instructive and persuasive.  In that case, the plaintiff, Key Custom, was the general contractor and builder for a home construction project in Florida on land owned by the Hunt Family II, Ltd. The project was referred to as the Groveland Project.  In connection with the Groveland Project, Key Custom obtained a commercial general liability insurance policy from Mid-Continent Casualty Company, which was in full force and effect at all relevant times.  As the project was moving forward toward completion, an accidental fire broke out and resulted in a total loss of the project.  The Hunt Family filed a lawsuit against Key Custom and its corporate officers, alleging breach of contract and seeking to recover money advanced to Key Custom to pay expenses for the project.  Multiple claims were also filed against Key Custom by subcontractors and third parties involved in construction of the project, seeking recovery of sums due for labor and material.  Key Custom made a timely claim against Mid-Continent under its CGL policy, seeking coverage "for the claims of the

---

[9] As New Hampshire notes in its reply memorandum, to accept Federal's argument that the contractual indemnity that T&B agreed to pay should be construed as covered "bodily injury" damages would transform the phrase "because of" in the policy into a phrase such as "in connection with" or "as a part of," which is not in accordance with the well-established legal principle, discussed below in Footnote 14, that an insurance policy's terms should be enforced as written when the words are clear and unambiguous and lead to no absurd consequences.  *See*, Footnote 14, citing La.C.C. art. 2046.

subject property's owner and various third-parties, including but not limited to, subcontractors, arising from the destruction of the [project]."   In its suit against Mid-Continent, Key Custom was not seeking coverage to repair the destroyed home; instead, it was seeking to recover for the losses it incurred in satisfying statutory construction lien claims and common law contract claims.  *Id.*, at 1314.

In *Key Custom*, the policy at issue contained similar language to that in the present case.  The CGL policy covered "those sums that the insured becomes legally obligated to pay as damages because of 'bodily injury' or 'property damage" to which this insurance applies."  *Id.*  "Property Damage" was defined as "[p]hysical injury to tangible property, including all resulting loss of use of that property.  All such loss of use shall be deemed to occur at the time of the physical injury that caused it."  *Id.*  As in the present case, the CGL policy also covered "insured contracts," which included leasing agreements, licensing agreements, and "that part of any other contract or agreement pertaining to your business . . . under which you assume tort liability of another party to pay for 'bodily injury' or 'property damage' to a third person or organization."  *Id.*

Mid-Continent denied coverage under the CGL policy on the basis that the claims being made against Key Custom were by subcontractors and/or suppliers for amounts not paid them for their work and would be considered "economic in nature."  Mid-Continent asserted that such claims were breach of contract claims that arose out of contracts between Key Custom and the claimant parties.  Similarly, the claims presented by the Hunt Family Limited Partnership for liens filed against the land were "economic claims arising out of a contract" between Key Custom and that limited partnership.  According to Mid-

Continent, those economic damages did not meet the definition of property damages or bodily injury as defined by the policy.  *Id.*, at 1315.

Mid-Continent filed a motion for summary judgment on the issue of insurance coverage under the CGL policy.  In opposition to that motion, Key Custom argued, without any legal support, that its claims arose from "tangible property damage," *i.e.*, the loss of the Groveland Project.  Alternatively, Key Custom argued that the claims against it were "so inextricably intertwined" with the loss of the Groveland Project, that they should be deemed claims for "property damage" and covered under the CGL policy.  In short, Key Custom contended that "[t]he fact that Key Custom may choose to pay subcontractors who are owed for the construction of that structure, if held to be an economic loss, should be construed to be within the scope of coverage because such economic damage is merely incidental to the underlying claims arising from the accidental fire – and therefore falls within the scope of coverage."  *Id.*, at 1318.

The court disagreed with Key Custom and explained that, although the various claims against Key Custom could be traced to the property damage to the Groveland Project caused by fire, those claims were "separate and independent claims which [had] their basis in either statute (the construction liens on the Hunt Family property) or common law (the breach of contract claims).  The court distinguished those claims from claims based either in tort law or that seek recovery for damage to tangible property.  The court explained that the Hunt Family's complaint alleged a sole claim for breach of a written agreement with Key Customs and simply sought recovery of the money it advanced to Key Custom – in other words, economic damages.  The Hunt Family did not allege any tort-

12

based claims, nor did it seek recovery for the destruction or loss of use of any tangible property.  *Id.*, at 1318.

Although the present case involves an underlying claim of "bodily injury," rather than "property damage," the reasoning of *Key Custom* is applicable to this case.  While it is true that the loan agreements Robins entered into with AXA can be traced to his underlying bodily injury claim against T&B in the sense that he would not have obtained those loans had he not been pursuing litigation against T&B relating to the injuries he sustained during the Kaiser plant explosion, Robins' breach of those loan agreements by settling with T&B without the consent of AXA's counsel is nevertheless a "separate and independent" act,[10] and any claim against him for breach of those loan agreements has its basis in common law relating to contracts, rather than in tort law.   T&B's decision and its contractual commitment to assume Robins' liability for that breach of contract claim in the "Memorandum of Agreement" (even if valid consideration for the "Memorandum of Agreement") does not automatically render such contractual claim covered by the CGL policy, which only covers claims "because of 'bodily injury,' 'property damage,'" etc., and which does not provide coverage for contract-based claims.[11]

_____

[10] It cannot be said that the liability for breaching the loans agreements was a direct result of the bodily injuries Robins sustained since such breach of contract liability never would have arisen absent Robins' independent act in settling with T&B without AXA's consent.  Since the breach of contract liability is not a direct result of bodily injury to Robins' person, it does not fall within the coverage of New Hampshire's CGL policy.

[11] While Federal contends throughout its opposition that New Hampshire's present coverage defense is "belated" and "new" and that New Hampshire "refused to honor the settlement" with Robins, such contentions are misleading and lack competent, evidentiary support.  In fact, the only competent evidence before the Court as to when New Hampshire began to raise the coverage defense in question is set forth in the October 24, 2001 letter of Mr. Madionna, wherein he specifically indicated that New

Additionally, New Hampshire has referred the undersigned to Louisiana jurisprudence that, although distinguishable factually, is nevertheless applicable to this case in reasoning.[12] Of most significance is *Johnson v. Evan Hall Sugar Co-op, Inc.*, 836 So.2d

---

Hampshire did not authorize or see the various provisions of the "Memorandum of Agreement" until after that agreement was signed and that, although New Hampshire agreed to pay the $5 million toward Robins' settlement as previously authorized, New Hampshire never agreed to the "hold harmless and indemnity" portion of the "Memorandum of Agreement" set forth in Paragraph 5. Thus, New Hampshire's coverage defense set forth in its motion for summary judgment is, by no means, "new" or "belated" because it has been New Hampshire's position since the time it first received notice of the signed "Memorandum of Agreement." Furthermore, it appears, based upon the evidence before the Court, that all New Hampshire was ever authorized to pay and agreed to pay in settlement of Robins' claims under the policy in question was $5 million, which amount it paid.

Moreover, although Federal spends significant time in its opposition (and attached exhibits) explaining why it was necessary for Federal to step in and pay the contractual indemnity payment set forth in Paragraph 5 of the "Memorandum of Agreement" on behalf of T&B (allegedly so that the overall agreement with Robins could be effectuated and the defense verdict in the underlying Kaiser litigation could be preserved), the undersigned finds that the reasons why Federal paid the indemnity payment are irrelevant if Federal cannot prove the most essential, underlying element of its case – that being, the indemnity payment in question was covered by T&B's policy of insurance with New Hampshire. Put another way, while it is true that this Court previously denied New Hampshire's Rule 12(b)(6) motion to dismiss and found that Federal had a viable claim against New Hampshire under subrogation principles based upon Federal's *allegations* that New Hampshire refused to pay a covered claim and exigent circumstances existed, Federal has now failed to *prove*, through competent, summary judgment evidence, that the claim in question was *covered* under New Hampshire's policy. Thus, even assuming the Affidavit of Michael Geiger, attached to Federal's opposition, creates genuine issues of material fact as to the "exigent circumstances" element of Federal's case, New Hampshire is nevertheless entitled to summary judgment because Federal has not presented competent evidence or jurisprudence establishing the other essential element of its case (*i.e.*, the covered claim element).

[12] As a federal court sitting in diversity, this Court is to apply Louisiana's rules of policy interpretation to this case, and Louisiana law is clear that interpretation of insurance policy provisions is to be governed by the rules pertaining to the interpretation of other types of contracts. *Principal Health Care of Louisiana*, at 242. The rules for interpreting contracts are set forth in various articles of the Louisiana Civil Code. Article

484 (La. App. 2002).  In that case, an employee who was injured in a rollover accident involving a tractor-trailer sued his employer for spoliation of evidence after his employer destroyed the trailer in question, and the employer asserted a third-party claim against its liability insurer.  Similar to the present case, in the liability section of the employer's insurance policy, the insurer was obligated to provide coverage to the insured employer for claims involving "bodily injury by accident" and to pay "damages because of bodily injury" to its employees.  Although "bodily injury" was not defined in that policy, the court held that, in the ordinary sense of the words," that phrase meant injury to the body.  *Id.*, at 488.  The court cited to the leading treatise on the subject of policy interpretation and noted that "bodily injury" means an "actual physical injury."  *Id.*, citing William Shelby McKenzie & H. Alston Johnson, III, *Insurance Law and Practice*, § 163, p. 336, in 15 *Louisiana Civil Law Treatise* (2d ed. 1996).  The court went on to find that the plaintiff's "bodily injury" claims involved only those damages that he incurred "as a direct result of the actual physical injury to his person."  *Id.*  It further held that the employee's claim against the employer for spoliation of evidence was "not derived from the injuries to his body," but that it was based on a "completely separate incident that occurred sometime after the accident that caused his bodily injuries."  *Id.*  The court found that such latter claim was for purely economic

---

2045 provides that "[i]nterpretation of a contract is the determination of the common intent of the parties."  Article 2046 goes on to state that "[w]hen the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties' intent."  Article 2047 provides that "[t]he words of a contract must be given their generally prevailing meaning."  Article 2048 provides that "[w]ords susceptible of different meanings must be interpreted as having the meaning that best conforms to the object of the contract."  Finally, Article 2050 provides that "[e]ach provision in a contract must be interpreted in light of the other provisions so that each is given the meaning suggested by the contract as a whole."

injury, and as a result, the employer's liability insurance policy, which limited payments to those for "damages because of bodily injury," did not cover the spoliation of evidence claim. *Id.*, at 489.

While *Evan Hall* is distinguishable factually from the present case in the sense that the claim for economic damages in that case is asserted through a separate suit, whereas in the present case the contractual indemnity claim is a provision in a "Memorandum of Agreement" relating to a bodily injury suit, the undersigned nevertheless finds that the legal reasoning underlying *Evan Hall* applies herein.  In *Evan Hall*, the spoliation claim relating to destruction of the trailer never would have arisen had the bodily injury claim concerning the tractor trailer not occurred; however, the court found that such claims were distinct and separate because the spoliation incident occurred sometime after the accident that caused the bodily injuries and because the spoliation claim was for economic damages, as opposed to bodily injury damages.  Similarly, in the present case, while the contractual indemnity claim relating to Robins' loan agreements with AXA never would have arisen had Robins not been injured in the Kaiser plant explosion and pursued litigation relating to that explosion, the contractual indemnity claim arose sometime after the Kaiser plant explosion and after Robins made the separate and independent act of breaching the loan agreements by settling with T&B without ascertaining AXA's consent.  Furthermore, the payment contained in Paragraph 5 does not directly relate to damages for "actual physical injury" to Robins' person; instead, it relates to purely economic damages and penalties.  As such, applying the reasoning of *Evan Hall* and the legal principle of interpreting contract language according to its generally prevailing meaning (as discussed in Footnote 14), such economic

damages/penalties are not covered under New Hampshire's policy.[13] [14]

_____

[13] The undersigned also notes that the language and organization of the "Memorandum of Agreement" itself suggest that the contractual indemnity payment set forth in Paragraph 5 is distinguishable from the payment of damages for bodily injuries resulting from the Kaiser Plant explosion set forth in Paragraph 1. As discussed above, Paragraph 1 of the "Memorandum of Agreement" provides that T&B and its insurers would pay Robins $5 million "as a result" of the Kaiser plant litigation. In the separate Paragraph 5, it states that T&B and its insurers agree to indemnify Robins relative to any claims by AXA, etc. for any amount owed not to exceed $1.2 million. Paragraph 5 makes no reference to the Kaiser plant litigation and only references claims by AXA, etc., which are contractual claims based upon the loan agreements between Robins and AXA. Had that $1.2 million payment been part of the damages "because of" Robins' bodily injury, that payment either would have been included in Paragraph 1 of the agreement, or Paragraph 5 of the Agreement would have referred to the fact that the $1.2 million was in settlement of the Kaiser plant litigation.

[14] As discussed above, in addition to providing coverage for damages that arise "because of" a claimant's bodily injury, T&B's policy with New Hampshire also provides coverage for payments that T&B assumes "under an Insured Contract because of Bodily Injury . . ." Since an "insured contract" is specifically defined in the New Hampshire policy as one in which T&B assumes another party's *tort* liability, T&B's agreement in Paragraph 5 of the "Memorandum of Agreement" to assume Robins' liability for breach of the loan contracts with AXA is not an "insured contract" under the policy for which coverage exists. Federal makes no argument in its opposition disputing this finding.

*See, Alea London v. Central Gulf Shipyard*, 2006 WL 845752, *6 (W.D.La. 2006)(A subcontractor, Maxtec, was working under a contract to provide roustabout services for Central Gulf, which in turn was working as a contractor under a contract to provide shipyard services to Global on Global's vessel. The contract between Maxtec and Central Gulf required Maxtec to defend and indemnify Central Gulf for any liability arising from injuries caused to Maxtec employees in the course of their employment under the subcontract. One of Maxtec's employees was injured and sued Global. Under its agreement with Global, Central Gulf agreed to provide a defense and indemnity in the suit filed against Global by the injured Maxtec employee. Central Gulf then sought indemnity from Maxtec under the terms of their contract. Maxtec's insurer, Alea, sought a declaratory judgment that its general liability policy with Maxtec did not require it to indemnify Central Gulf. The policy contained a liability exclusion like that in the present case. The Western District concluded that Alea was not required to indemnify Central Gulf, reasoning that "[I]t is clear that the liability that Maxtec has assumed from Central Gulf is Central Gulf's contractual obligation to Global, *i.e.*, contract-based, not tort-based . . . because Central Gulf would not have incurred that liability in the absence of its contract with Global." The court also found no basis in

Although, in its opposition, Federal does not present any jurisprudential support for its assertion that the contractual indemnity payment set forth in Paragraph 5 of the "Memorandum of Agreement" is covered by the CGL policy in question and therefore fails to refute New Hampshire's argument that it lacks an essential element of its subrogation claim in this suit,[15] it argues that New Hampshire nevertheless waived its denial of coverage position by its own prior inconsistent conduct. Specifically, Federal contends that, just a few days after the "Memorandum of Agreement" in question was executed, Mr. Maddiona, Assistant Vice President of AIGTS, the claims administrator for New Hampshire, settled the bodily injury claims of eight (8) other personal injury claimants in the Kaiser litigation, and the settlement agreements for those other claims also included a $2 million "payback"

_____

federal case law for the concept of "indirect tort liability").

[15] Instead of presenting jurisprudential support refuting New Hampshire's denial of coverage position, Federal presents legal support for the position that "consideration" for a bodily injury settlement may take various forms, including payment of sums borrowed by the plaintiff to continue litigation. While that may be true, such legal support only establishes that a valid settlement agreement existed between T&B and Robins; it does not establish that all of the elements of that settlement agreement are covered by T&B's policy with New Hampshire. The latter issue is the subject of the present motion for summary judgment, and the undersigned finds that Federal has failed to carry its burden of proof in that regard. *See*, New Hampshire's reply, R. Doc. 57, p. 6 (where New Hampshire succinctly phrased the pertinent issue in this motion: "[T]he principal question for the Court is not whether T&B validly agreed to indemnify Robins for the $900,000 loan repayment and the $300,000 penalty he owed to AXA as a result of the contract breach, but whether the payments made in reference to that agreement are covered under the New Hampshire policy'"); *Central Illinois Light Co. v. Home Ins. Co.*, 213 Ill.2d 141, 821 N.E.2d 206, 225-226 (Ill. 2004)(An insured entity may become legally obligated to pay taxes, fines, penalties, or other debts; however, the mere fact that those payments are made pursuant to a legal obligation does not mean that they are covered by the insured's policy); *Williams v. City of Baton Rouge*, 715 So.2d 15 (La.App.1 Cir. 1998)(Liability insurer was not liable for interest and costs that the insured had become legally obligated to pay, where the policy limited liability to sums which the insured became obligated to pay as damages).

provision in addition to lump sum settlement payments and other concessions.  Thus, Federal asserts that, because New Hampshire subsequently agreed to cover $2 million "payback" provisions in other similar settlement agreements, it has waived its right to assert a coverage defense as to that provision in this litigation.  In so arguing, Federal relies upon *Steptore v. Masco Const. Co.*, 93-2064 (La. 8/18/94), 643 So.2d 1213.

*Steptore* involved an insurer's assumption of its insured's defense without first obtaining a reservation of rights to contest coverage liability.  *Id.*, at 1217.  The Louisiana Supreme Court held that an insurer must reserve its rights vis-a-vis its insured to avoid being estopped from raising coverage defenses.  *Id.*  The U.S. Fifth Circuit Court of Appeals, however, has specifically noted that the waiver principle articulated in *Steptore* was "intended to protect the insured from conflicts of interest that might arise between the insurer and the insured in connection with the defense of the insured."  *American Intern. Specialty Lines Ins. Co. v. Canal Indem. Co.*, 352 F.3d 254, 270 (5th Cir. 2003).[16]  It has further held that the "professional responsibility considerations surrounding the attorney-client relationship that warranted the application of waiver principles in *Steptore* do not arise in cases involving a dispute between two insurers, which involve no insurance triangle of insurer-attorney-insured."  *Id.*

---

[16] The Louisiana Supreme Court, in *Steptore*, clarified that, in the insurance context:

> [w]aiver principles are applied stringently to uphold the prohibition against conflicts of interest between the insurer and the insured which could potentially affect legal representation in order to reinforce the role of the lawyer as the loyal advocate of the client's interest.

*Id.*, at 1216 (citations omitted).

The Fifth Circuit therefore found that *Steptore* was inapplicable to the facts of *Canal Indem.*, which was a suit by a liability insurer against a co-insurer, seeking a declaration regarding its liability for pollution-related damages and claims expenses stemming from an accident, as well as reimbursement from the co-insurer for payments it made with respect to a similar earlier accident.   In *Canal Indem.*, the co-insurer contended that the liability insurer had waived its right to contest liability for damages and expenses because it had erroneously paid the co-insurer a pro-rata share, under the same policy, of damages and expenses arising from a similar earlier accident.   The Fifth Circuit found that the co-insurer's waiver argument, based upon *Steptore*, was foreclosed by its prior decision in *FDIC v. Duffy*, 47 F.3d 146 (5th Cir. 1995) and by La.C.C. arts. 2299-2305 (2003).   *Id.* According to the Fifth Circuit, applying the Louisiana law set forth in *Duffy*, an insurer's "[c]onduct in paying one claim under a policy does not prevent the insurer from raising defenses to the policy."   *Id.,* quoting *Duffy*, 47 F.3d at 150 (citing *Monju v. Cont'l Cas. Co.*, 487 So.2d 729m, 732 (La.Ct.App. 5th Cir. 1986)).[17]

Additionally,  La.C.C. arts. 2299-2305 concern the "payment of a thing not owed," and the Fifth Circuit has found that, under those articles, an insurer does not, by virtue of making a payment on a claim, waive the right to assert coverage defenses to a subsequent

---

[17] In *Duffy*, an insurer's non-coverage defense was based upon its professional liability policy's provision excluding from coverage any claims arising from prior intentional and dishonest acts.  Although the insurer did not raise its non-coverage defense until six (6) years after it became aware that its insured was adjudged dishonest (and thereby excluded from coverage) and continued to make payments on the insured's claims throughout that time, the Fifth Circuit concluded in *Duffy* that such conduct does not suffice to waive a non-coverage defense under Louisiana law.  The Fifth Circuit was not persuaded by the argument that the insurer's payment of claims was conduct "inconsistent with the position that the policy is void *ab initio*."  *Id.*

claim.  In the *Canal Indem. Co.* opinion, the Fifth Circuit noted that Louisiana's intermediate appellate courts have relied upon Articles 2299-2305 in holding that an insurer's erroneous, or even negligent, payment of a claim to its insured does not bar the insurer from later recouping the amount paid.[18]  It further noted that, under La.C.C. art. 2299, even "a person who knowingly . . . has paid . . . a thing not owed may reclaim" the amount paid from the recipient."  La.C.C. art. 2299.

Applying the above principles set forth in Louisiana law to the facts in *Canal Indem.*, the Fifth Circuit concluded that, even if the liability insurer's payment to the co-insurer relative to an earlier claim under the same policy was made knowingly, such payment did not waive the liability insurer's right to reclaim that amount later nor did it waive the right of the liability insurer to contest coverage on a later, similar claim under the same policy. *Canal Ind.*, 271.  In sum, the Fifth Circuit "declined to extend application of the waiver rule articulated in *Steptore* to the relationship among insurers particularly when, under the facts presented, such application would contravene the Louisiana Civil Code and this Circuit's precedent."  Thus, the Fifth Circuit rejected the contention that the liability insurer waived its right to rely on its "other insurance" clause as a defense to coverage for the present loss by having paid a prior claim wherein it did not raise that coverage defense.  *Id.*

For the reasons articulated in *Canal Indem.*, the undersigned rejects Federal's reliance upon *Steptore* and its waiver argument.  This case, like *Canal Indem.*, is not a case where an insurer defended an insured without a reservation of rights despite knowledge

---

[18] *See, Canal Indem.*, at 271, citing *Dear v. Blue Cross of Louisiana*, 511 So.2d 73, 74-76 (La.Ct.App. 3d Cir. 1987); *Central Sur. & Ins. Corp. v. Corbello*, 74 So.2d 341, 344 (La.Ct.App. 1st Cir. 1954); *Pioneer Bank & Trust Co. v. Dean's Copy Prods., Inc.*, 441 So.2d 1234, 1236-37 (La.Ct.App. 2d Cir. 1983).

of a coverage defense, and it does not involve the "professional responsibility considerations surrounding the attorney-client relationship" that resulted in the application of waiver principles in *Steptore*. Instead, this case is a dispute between two (2) insurers for reimbursement of a contractual indemnity payment made by one of those insurers, wherein the other insurer has raised, from the beginning, a coverage defense to such payment. The fact that New Hampshire may have subsequently covered similar indemnity payments in settlement of other Kaiser litigation claims under the same policy does not waive its right to contest coverage and payment in this suit under Louisiana law as specifically discussed by the Fifth Circuit in *Canal Indemnity*.[19]

Accordingly, because Federal has not come forward with any jurisprudential support for its assertion that the contractual indemnity payment that it made on behalf of T&B is covered under T&B's policy with New Hampshire and since its argument that New Hampshire has waived its coverage defense lacks merit, Federal will be unable to establish the requisite elements of its claims for subrogation. As a result, New Hampshire's summary judgment motion should be granted, and this case should be dismissed with prejudice. Since the undersigned is able to issue a recommendation relative to New

---

[19] *See also, Williams v. Allstate Indem. Co.*, 2009 WL 723526, at *4 (E.D.La. 2009)(citing *Canal Indem.* and holding that Allstate had not waived its coverage defense through its claims handling process since an insurer does not, by virtue of making a payment on a claim, waive the right to assert coverage defenses); *Stokes v. Allstate Indem. Co.*, 2007 WL 1875847, *3 (E.D.La. 2007)(Plaintiffs' only contention that Allstate had acted inconsistently in its position that property damage was caused by flood and therefore was not covered was that Allstate had paid something to the plaintiffs and therefore waived its right to say that coverage was excluded. The Eastern District of Louisiana cited *Canal Indem.* and held that, even if Allstate knowingly paid claims to the plaintiffs to which the plaintiffs were not entitled, it did not waive its right to reclaim those funds, and as a result, the plaintiffs could not assert that Allstate had waived its right to defenses under the contract).

Hampshire's motion based upon the parties' written briefs and without the necessity of oral argument, Federal's motion for oral argument should be denied as moot.

## RECOMMENDATION

For the above reasons, it is recommended that the Motion for Summary Judgment (R. Doc. 50) filed by defendant, New Hampshire Insurance Company, should be **GRANTED** and that this matter should be **DISMISSED WITH PREJUDICE**. It is further recommended that the Motion for Oral Argument (R. Doc. 60) filed by plaintiff, Federal Insurance Company, should be **DENIED AS MOOT**.

Signed in chambers in Baton Rouge, Louisiana, July 30, 2010.

**MAGISTRATE JUDGE CHRISTINE NOLAND**

23